UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/3/2023
```

------------------------------------------------------------------ X
                                                             :

RUBEN PIZZARO,                            :
                                                             :
                        Movant,      :               1:21-cv-1149-GHW
                                                               :
                     -against-          :               1:16-cr-54-GHW
                                                               :
UNITED STATES OF AMERICA,       :       MEMORANDUM OPINION &
                                                               :                    ORDER
                            Respondent.   :
------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

## I.  INTRODUCTION

       After a trial, Ruben Pizzaro was convicted of participation in a series of crimes, including

murder.  This Court sentenced Mr. Pizzaro to 25 years of incarceration on each count of conviction,

for a total effective sentence of 75 years.  Mr. Pizzaro appealed his conviction, and the Second

Circuit affirmed his conviction on all counts.  He now challenges his conviction and sentence on

several grounds under 28 U.S.C. § 2255, including ineffective assistance of counsel at various stages

of the proceedings, alleged insufficiency of the evidence, and alleged misconduct by the

Government.  Further, Mr. Pizzaro submits that he is actually innocent of the crimes for which he

was convicted.

       Many of Mr. Pizzaro's allegations are conclusory, and some are outright contradicted by the

record.  And at bottom, all of his claims fail because he cannot show that he was prejudiced.  Every

claim that Mr. Pizzaro advances in this motion relies on the story that was told, and rejected, at trial

and on appeal:  That Mr. Pizzaro killed his victim based on a personal feud unrelated to drug

trafficking.  As the trial-court jury, this Court, and a Second Circuit appeals panel found, while that

may be a piece of the story, there was more than ample evidence to support the conclusion that Mr.

Pizzaro possessed—and used—his gun to further his gun trafficking business.  Because the Court finds that Mr. Pizzaro's claims are conclusory, contradicted by the record, and fail to show prejudice, his motion to vacate his conviction and sentence is denied without a hearing.

## II.   BACKGROUND

### A.  Trial and Conviction

On June 13, 2018, a jury convicted Ruben Pizzaro, a/k/a "Chulo," of one count of conspiring to possess with intent to distribute cocaine and cocaine base "crack," in violation of 21 U.S.C § 846 and § 841(b)(1)(B) ("Count One"), one count of murder through use of a firearm, in violation of 18 U.S.C. §§ 924(j) and (2) ("Count Two"), and one count of firearm use and possession, in violation of 18 U.S.C. §§ 924(c) and (2) ("Count Three").  Dkt. 157.

At trial, the Government presented witness testimony and physical evidence proving that Mr. Pizzaro was a member of the "Arthur Avenue Crew," a group of individuals who sold crack and cocaine in and around Arthur Avenue and 180th Street in the Bronx, New York.  *See* Trial Transcript ("Tr.") 427:17–429:19.[1]  Members of the Arthur Avenue Crew, including Mr. Pizzaro, engaged in violence and threats of violence to prevent their nearby rivals—the "Hughes Avenue Crew"—from encroaching on their customer base.  Tr. at 174:19–175:4, 445:23–447:5.  During October and November 2015, these rival crews engaged in back and forth shootings on four separate occasions.  Tr. at 231:22–232:3, 260:9–19, 271:18–272:3, 484:18–23.  The escalating violence reached its crescendo on November 24, 2015 when Mr. Pizzaro chased down, shot, and killed David Rivera, a member of the Hughes Avenue Crew.  Tr. at 231:22–232:3.

---

[1] The trial ran for six days.  The transcript of the trial is filed in separate documents at Dkt. No. 106 (Day 1, Part 1), Dkt. No. 108 (Day 1, Part 2), Dkt. No. 112 (Day 2); Dkt. No. 114 (Day 3); Dkt. No. 116 (Day 4); Dkt. No. 118 (Day 5); Dkt. No. 120 (Day 6).  The pages of the transcript run sequentially from Day 1 through Day 6.  For ease of reference, the Court refers in this opinion to the "Trial Transcript" ("Tr.") generally rather than to each docket number.

The Government's case relied heavily on two witnesses, Anthony Ramos and Nathaniel Torres. These witnesses knew Mr. Pizzaro well and interacted with him on a regular basis. Mr. Ramos testified that, between 2005 and 2013, he sold between 40 and 50 bags of crack and cocaine per day with Mr. Pizzaro. Tr. at 427:17–429:19. Mr. Torres testified that Mr. Pizzaro recruited him to the Arthur Avenue Crew in 2013 and gave him crack and cocaine to sell. Tr. at 164:6–168:25. Mr. Torres gave the profits from these sales to Mr. Pizzaro. Tr. at 168:8–9.

In 2013, Mr. Pizzaro left the Bronx for two years.[2] Mr. Ramos and Mr. Torres testified that when Mr. Pizzaro returned to the Bronx in 2015, he resumed selling crack and cocaine with members of the Arthur Avenue Crew. Tr. at 118:11–13, 450:9–23. At that time, according to Mr. Ramos, he was giving Mr. Pizzaro 20 grams of cocaine once or twice per week. Tr. at 451:20–24. Mr. Pizzaro, Mr. Ramos, and Mr. Torres would sell half of that amount as powder cocaine. Tr. at 465:16–466:9. Mr. Pizzaro would then cook the other half in to crack which the trio would also sell in and around the Arthur Avenue block. Tr. at 462:16–24.

The Government presented evidence that Mr. Pizzaro used firearms in furtherance of his post-2015 drug sales. Mr. Torres testified that Mr. Pizzaro owned multiple guns, storing one (a .357 Magnum) in the "Stash House" where he regularly cooked, bagged, and stored drugs, and carrying one (a nine millimeter) on his person. Tr. at 192:16–20, 194:24–195:12, 203:19–205:19. He also testified that the reason he and Mr. Pizzaro had these firearms was "for protection" because they were "at war with Hughes Avenue and there was a lot of back and forth shooting." Tr. at 205:10–14. Mr. Ramos corroborated Mr. Torres's testimony that Mr. Pizzaro kept a .357 Magnum in the Stash House. Tr. at 470:10–471:11.

---

[2] During this time, Mr. Pizzaro was incarcerated on federal charges, of which he was ultimately acquitted after trial. This Court ruled that, at trial, the parties were permitted only to offer evidence that Pizzaro was "absent" from the Bronx during this time, without referencing his incarceration or acquittal. Dkt. No. 94 ("Pretrial Conf. Tr.") at 69.

Mr. Pizzaro and the Arthur Avenue Crew sold drugs near the Hughes Avenue Crew.  Tr. at 172:16–173:3.  So close, in fact, that the Arthur Avenue Crew and the Hughes Avenue Crew would often compete for the same customers.  Tr. at 205:10–206:14.  This led to violent back and forth shootings between the two crews, including between Mr. Pizzaro and David Rivera, the latter of whom was a member of the Hughes Avenue Crew.  Tr. at 174:19–175:4, 445:23–447:5.  Mr. Ramos testified that he saw Mr. Pizzaro shoot Mr. Rivera in 2010 and Mr. Torres testified that Mr. Pizzaro ordered him to shoot at a different Hughes Avenue Crew member in 2013.  Tr. at 179:13–181:10.

During October and November 2015, three shootings between the Arthur Avenue Crew and Hughes Avenue Crew occurred in rapid succession.  The first shooting happened on October 31, 2015.  Mr. Torres testified that he and Mr. Pizzaro went to talk to members of Hughes Avenue Crew after some of their members 'jumped' Mr. Torres's brother.  Tr. at 268:9–269:6.  Mr. Pizzaro told Mr. Torres to get the gun from the Stash House and bring it with him.  Tr. at 269:16–25.  On their way to the Hughes Avenue block, Darwin Ortiz, a member of the Hughes Avenue Crew, shot at Mr. Torres.  Tr. at 271:18–272:3.  Mr. Torres shot back and hit Mr. Ortiz.  Tr. at 272:4–14.

The next day, November 1, 2015, members of the Hughes Avenue Crew—including David Rivera—went to the Arthur Avenue block and fired shots at Mr. Pizzaro and Mr. Torres while they were in front of the Stash House.  Tr. at 260:9–19.  Mr. Torres testified that he and Mr. Pizzaro ran into the Stash House and up to the roof of the building, from which Mr. Torres shot in the direction of Mr. Rivera on the street.  Tr. at 260:20–263:3.

The day after that, November 2, 2015, Mr. Ramos was riding in a car with Mr. Pizzaro when Mr. Pizzaro said "that's one of the new members from the Hughes crew," and got out of the car.  Tr. at 484:6–9.  Mr. Ramos then heard gunshots and saw Mr. Pizzaro run first into a laundromat and then down to Arthur Avenue.  Tr. at 484:18–23.  Karl Goodloe, an EMT who was working in the same area, also heard gunshots and subsequently treated Richard Feliz for a gunshot wound through

the hand.  Tr. at 665:7–669:1.  Mr. Torres testified that Mr. Pizzaro told him that he shot someone in the hand on November 2, 2015 because that person was "flagging," or claiming to represent the Hughes Avenue Crew.  Tr. at 295:19–296:21.

After these shootings, Mr. Pizzaro and Mr. Torres changed the location of their stash house, stopped selling drugs, and hid "from Hughes Avenue [crew] and the cops."  Tr. at 216:4–218:9. According to Mr. Torres, this was because "there was a lot of tension on the block because of the back and forth shootings."  Tr. at 217:1–4.

On November 24, 2015, Mr. Torres was walking with Mr. Pizzaro when they saw Mr. Rivera.  Tr. at 229:5–16, 230:8–19.  According to Mr. Torres, Mr. Pizzaro then crouched behind a car and pulled out and cocked his gun, at which point Mr. Torres told him to "leave it alone."  Tr. at 231:12–16.  Mr. Pizzaro responded "no, because [Mr. Rivera] came and shot at us on the block," and approached Mr. Rivera.  Tr. at 231:17–231:22.  At this point, Mr. Rivera turned around and, upon seeing Mr. Pizzaro with a gun, ran.  Tr. at 231:22–232:3.  Mr. Pizzaro and Mr. Torres ran after him.  *Id.*  Mr. Pizzaro started shooting at Mr. Rivera, who eventually fell.  *Id.*  When Mr. Rivera tried to get back up, Mr. Torres punched him, and Mr. Pizzaro shot him again.  *Id.*

In addition to Mr. Torres's account of Mr. Rivera's murder, two eyewitnesses described this sequence of events in substantially the same terms.  Tr. at 77:5–78:24, 112:21–120:6.  One eyewitness identified Mr. Pizzaro in court, and recounted him saying "oh you remember?" while chasing Mr. Rivera.  Tr. at 144:6–115:24.  The government also presented surveillance video of the chase.  Government Exhibit ("GX") 303.

Mr. Torres and Mr. Pizzaro then left the scene and went back to a shelter where Mr. Pizzaro had been living.  Tr. at 233:3–11.  Mr. Pizzaro gave Mr. Torres a new set of shoes and told him to change so that he could get rid of the old shoes.  Tr. at 233:29–234:9.  Mr. Pizzaro also told Mr. Torres to throw away his phone because he "didn't want to be tracked down."  Tr. at 236:20–237:6.

Mr. Pizzaro told Mr. Torres that he left the gun used to shoot Mr. Rivera with his girlfriend at the shelter.  Tr. at 236:6–13.  Ballistics evidence from the scene of Mr. Rivera's murder confirmed that the same gun was used to shoot Mr. Feliz on November 2.  Tr. at 701:6–13, 703:1–711:3.

Mr. Pizzaro's trial counsel did not call any witnesses and Mr. Pizzaro did not testify.[3]  Mr. Pizzaro did not contest the fact that he killed Mr. Rivera.  Instead, his trial counsel argued in opening and closing that Mr. Pizzaro killed Mr. Rivera based on a decade-long personal dispute that was not related to their respective drug dealing activities.  *See* Tr. at 67, 824.

### B.  Sentencing and Appeal

On June 13, 2017, the jury convicted Mr. Pizzaro on all counts charged.  Tr. at 955:14–956:25.  As to the narcotics conspiracy, the jury found that Mr. Pizzaro agreed to distribute or possess with intent to distribute cocaine and 28 grams or more of crack.  Tr. at 955:25–956:6.  As to the firearms charge, the jury found that Mr. Pizzaro brandished or discharged the guns that he used during or in furtherance of the narcotics conspiracy.  Tr. at 956:20–25.

On February 23, 2018, this Court sentenced Mr. Pizzaro to consecutive terms of 25 years of imprisonment on each of the three counts of conviction, to be followed by four years' supervised release, and imposed a $300 special assessment.  Dkt. No. 157.

Mr. Pizzaro filed a notice of appeal on March 13, 2018.  Dkt. No. 158.  In that appeal, he raised three claims:  (1) that there was insufficient evidence that the firearm used to murder Rivera was used or carried during and in relation to, or possessed in furtherance of, the narcotics conspiracy charged in Count One; (2) that there was insufficient evidence that Rivera's murder was premeditated and that the district court failed to provide a premeditation instruction to the jury; and (3) that Count Three of the Indictment was impermissibly duplicitous because it alleged three distinct occasions on which Pizzaro used, carried, or possessed a firearm in furtherance of the

---

[3] This Court ensured Mr. Pizzaro was aware of this right to testify before his trial counsel rested.  Tr. at 722:11–723:2.

narcotics conspiracy, each of which should constitute a separate offense. *See United States v. Pizzaro*, 797 F. App'x 607, 609 (2d Cir. 2020). The Second Circuit, however, affirmed Mr. Pizzaro's convictions. *Id.*

First, the court held that a rational jury could find beyond a reasonable doubt that on November 24, 2015, Pizzaro either carried the firearm in question during and in relation to the narcotics conspiracy charged in Count One, or possessed that firearm in furtherance of such crime, or both. *Id.* at 609–10. The court pointed to evidence presented at trial that Mr. Pizzaro had "purchased and possessed this specific pistol to protect himself from . . . the 'Hughes Avenue Crew,' with which Pizzaro competed for 'turf' and customers in his drug distribution conspiracy," and that "the same gun used to murder Rivera had been used on November 2, 2015 . . . to shoot and wound Hughes Avenue Crew member Richard Feliz, a drug distribution rival." *Id.* at 610.

The court also rejected Mr. Pizzaro's argument that the murder of Mr. Rivera was purely for personal reasons unrelated to drug trafficking. First, the "argument, made with respect to *use*, cannot defeat the valid inference a juror could draw as to why Pizzaro *possessed* the gun at all on the day of the murder. Possessing the gun in furtherance of the distribution conspiracy . . . is independently sufficient for culpability under § 924(c), regardless of use." *Id.* (emphasis in original). Next, the court rejected the "personal animosity defense" because "it was presented at trial, where the jury was entitled to reject it on the basis of sufficient evidence to find that Pizzaro murdered Rivera at least in part for reasons relating to the underlying distribution conspiracy." *Id.* Finally, the court of appeals rejected Mr. Pizzaro's argument that his hiatus from selling drugs immediately prior to murdering Mr. Rivera meant that he was no longer a participant in the narcotics conspiracy because there was "sufficient evidence for a rational jury to conclude that, despite this hiatus, Pizzaro used this firearm to eliminate Rivera, a known competitor to Pizzaro's drug trafficking operation, in relation to the [narcotics conspiracy] offense." *Id.*

With regard to Mr. Pizzaro's premeditation challenge, the court observed that whether premeditation was an element of a 924(j) conviction was an open question, but irrelevant here, where "the evidence of premeditation was overwhelming." *Id.* at 610 n.1. It pointed to evidence of the long running drug feud with Rivera, the fact that Mr. Pizzaro crouched behind a car to remove and cock his gun before chasing Mr. Rivera, and that, when Mr. Torres hit Mr. Rivera and knocked him back to the ground, Mr. Pizzaro shot him again. *Id.* at 611.

The court also rejected Mr. Pizzaro's duplicitousness challenge to Count Three. *Id.* at 611–12. Mr. Pizzaro claimed that, "[a]lthough the Government alleged that each of the shootings had a nexus to the same narcotics conspiracy, the facts surrounding the separate shootings differed significantly, including the involvement of different shooters, different victims and the use of different guns." Brief for Defendant-Appellant, *United States v. Pizzaro*, No. 18-0707-cr, at *41 (2d Cir. Nov. 15, 2018). Mr. Pizzaro argued that, as a result, the charge as to Count Three was duplicitous. *Id.* But the court explained that unanimity among jurors is not required "as to the specific gun a defendant possessed, used, or carried in violating 924(c)." *Pizzaro*, 797 F. App'x at 612. Further, it pointed to the fact that even if unanimity were required on a § 924(c) charge, "[the Second Circuit] has 'time and again[ ] held that a general charge regarding unanimity is ordinarily sufficient to protect the defendant's right to a unanimous verdict.'" *Id.* (quoting *United States v. Trupin*, 117 F.3d 678, 687 (2d Cir. 1997)). The Second Circuit therefore concluded that Mr. Pizzaro's challenge failed plain error review because this Court gave a general unanimity instruction and a special unanimity instruction on Count Three. *Id.*

### C. Mr. Pizzaro's 2255 Petition

Mr. Pizzaro filed a motion to vacate his sentence under 28 U.S.C. § 2255 timely on February 9, 2022 (the "Motion"). Dkt. No. 178 ("Mot."). Because Mr. Pizzaro is proceeding *pro se*, the Court must construe his motion "liberally to raise the strongest arguments it suggests." *Nielsen v. Rabin*,

746 F.3d 58, 63 (2d Cir. 2014) (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013)).  Mr.

Pizzaro raises four grounds for his petition to vacate.  First, Mr. Pizzaro asserts that he suffered

ineffective assistance of counsel at both the trial and appellate levels.  Mot. at 9–10.  Second, he

argues that the Government did not prove all of the requisite elements of drug conspiracy at trial.

Mot. at 4–6.  Third, Mr. Pizzaro asserts he is 'actually innocent' of all counts for which he was

charged.  Mot. at 4–6, 12.  Finally, he asserts that the Government engaged in prosecutorial

misconduct by knowingly presenting false testimony at trial and withholding material that must be

disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500.

Mot. at 7–8.

In support of his motion, Mr. Pizzaro submitted two news articles about the 2008 shooting

of Ronney Vargas as well as a one page excerpt from a call transcript.  Dkt. No. 178 Exs. A–B.  Mr.

Pizzaro claims that the news articles are factual evidence that his personal dispute with Mr. Rivera

was not related to drugs.  Mot. at 12, Ex. A.  He claims that the call log is "factual evidence that his

§ 924(c) charges were not the result of a drug war."  Mot. at 12, Ex. B.[4]

### D.  Mr. Pizzaro's Motion to Supplement Pursuant to *United States v. Davis*

On May 10, 2021, Mr. Pizzaro filed a motion for leave to supplement his § 2255 motion.

Dkt. No. 185.  Specifically, he sought to add to his § 2255 motion that he is "actually innocent" of

all counts under *United States v. Davis*, 139 S. Ct. 2319 (2019).  Dkt. No. 186 (the "Supplement").  Mr.

---

[4] In his reply brief, Mr. Pizzaro also raised two arguments purportedly regarding why this Court purportedly lacked jurisdiction over his case. First, he claims that "21 U.S.C.S. § 841 and 846 are not crimes of violence within the meaning of 18 U.S.C.S. § 16(b)" and therefore cannot serve as predicate offenses for his § 924(c) charge. Dkt. No. 183 ("Reply") at 4. Second, he argued that after the decision in *Bailey v. United States*, 516 U.S. 137 (1995), convictions under § 924(c) must be premised on a definition of "use" that "connote[s] more than mere possession." *See* Reply at 4; *United States v. Morrison*, 98 F.3d 619, 629 (D.C. Cir. 1996) (quoting *Bailey*, 516 U.S. at 143). Mr. Pizzaro's argument concerning "use" is erroneous because Congress amended § 924(c) in 1998 to " include[ ] the word 'possesses' in addition to 'uses or carries' in its principal paragraph"; as a result, pre-1998 decisions analyzing limits of the word "use" (but not accounting for "possesses") are irrelevant. *See United States v. O'Brien*, 560 U.S. 218, 232–33 (2010). And for the reasons discussed in Part IV(A) of this opinion, Mr. Pizzaro's argument concerning 21 U.S.C. §§ 841 and 846 as predicates to his § 924(c) charge is erroneous also; in any event, that argument does not go to this Court's subject-matter jurisdiction.

9

Pizzaro argues that *Davis* stands for the proposition that narcotics conspiracy is not a "crime of violence" within the meaning of § 924(c).  *Id.*

### E.  Mr. Pizzaro's Motion to Dismiss Counts of Conviction Due to Lack of Jurisdiction

Finally, on January 24, 2023, Mr. Pizzaro filed a motion to dismiss his counts of conviction on the grounds that this Court lacked jurisdiction to impose a sentence for the crimes under which he was convicted.  Dkt. No. 193.  Specifically, Mr. Pizzaro argues that only New York state courts, not any federal court, had jurisdiction over his crimes because they were committed in New York.  *See id.* at 5–6.

## III.   LEGAL STANDARD

### A.  Standard of Relief Pursuant to 28 U.S.C. § 2255

Mr. Pizzaro's right to collateral relief is governed by 28 U.S.C. § 2255, which provides:  "A prisoner in custody under sentence of a court established by an Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).  Relief under § 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Cuoco v. United States*, 208 F.3d 27, 29 (2d Cir. 2000) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).  Although § 2255, by its terms, provides grounds for attacking "the sentence," the term "sentence" has been interpreted as a generic term encompassing all of the proceedings leading up to the sentence, including the conviction.  *See, e.g., Hall v. United States*, 58 F.4th 55, 58 (2d Cir. 2023) (vacating a conviction under § 2255).

"Because requests for habeas corpus relief are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir. 1995), *abrogated on other grounds by Mickens v. Taylor*, 535 U.S. 162 (2002). "[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *United States v. Frady*, 456 U.S. 152, 165 (1982). Even constitutional errors will not be redressed through a § 2255 petition unless they have had a "substantial and injurious effect" that results in "actual prejudice" to the petitioner. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637 (1993) (citations omitted); *Underwood v. United States*, 166 F.3d 84, 87 (2d Cir. 1999) (applying *Brecht's* harmless-error standard to a § 2255 petition).

Section 2255 "may not be used as a substitute for direct appeal." *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993) (citing *Frady*, 456 U.S. at 165). Thus, "[i]n general, a claim may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review." *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007) (citation omitted). That rule does not generally apply, however, to claims of ineffective assistance of counsel. *See Mui v. United States*, 614 F.3d 50, 54 (2d Cir. 2010) ("[A] petitioner may bring an ineffective assistance of counsel claim [in a § 2255 motion] whether or not the petitioner could have raised the claim on direct appeal." (citing *Massaro v. United States*, 538 U.S. 500, 509 (2003))).

### B. When an Evidentiary Hearing is Required

Pursuant to Rule 8(a) of the Rules Governing § 2255 Proceedings for the United States District Courts, if a § 2255 motion is not dismissed on preliminary review, the "judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Section 2255(b) requires a district court to hold an evidentiary hearing on a petitioner's claims "[u]nless the motion and the files and

11

records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also McLean v. United States*, Nos. 12-cv-1954, 12-cv-7362, 12-cv-7559, 08-cr-789, 2016 WL 3910664, at *8 (S.D.N.Y. July 31, 2016) ("[A] hearing is not required 'where the allegations are insufficient in law, undisputed, immaterial, vague, palpably false or patently frivolous.'" (quoting *United States v. Malcolm*, 432 F.2d 809, 812 (2d Cir. 1970))).

"To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013) (citations omitted). "Airy generalities, conclusory assertions and hearsay statements will not suffice . . . ." *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (quoting *United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987)). Nor will allegations that are "vague, conclusory, or palpably incredible." *Gonzalez*, 722 F.3d at 130. As the Second Circuit has explained:

> The procedure for determining whether a hearing is necessary is in part analogous to . . . a summary judgment proceeding. The petitioner's motion sets forth his or her legal and factual claims, accompanied by relevant exhibits: e.g., an affidavit from the petitioner or others asserting relevant facts within their personal knowledge and/or identifying other sources of relevant evidence. The district court reviews those materials and relevant portions of the record in the underlying criminal proceeding. The Court then determines whether, viewing the evidentiary proffers, where credible, and record in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a *prima facie* case for relief. If material facts are in dispute, a hearing should usually be held, and relevant findings of fact made.

*Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (internal citations omitted). However, "a district court need not assume the credibility of factual assertions, as it would in a civil case, where the assertions are contradicted by the record in the underlying proceeding." *Id.* at 214.

## IV.   DISCUSSION

As an initial matter, Mr. Pizzaro's motions to supplement his petition under *Davis* and to dismiss his case for lack of jurisdiction are meritless. Further, while the Court construes Mr.

Pizzaro's petition broadly to claim that (1) counsel at the trial and appellate levels were constitutionally ineffective, (2) the Government did not prove all of the requisite elements of drug conspiracy at trial, (3) he is 'actually innocent' of all counts with which he was charged, and (4) the Government engaged in prosecutorial misconduct by presenting knowingly false testimony at trial and withholding *Brady* and Jencks Act material, none of those arguments entitle Mr. Pizzaro to a vacatur of his conviction or sentence.  As a result, Mr. Pizzaro's petition will be denied.

### A.  Mr. Pizzaro's Motion to Supplement Pursuant to *Davis*

As a threshold matter, Mr. Pizzaro's motion to supplement his habeas petition as a result of Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), is denied because it is meritless.  "After *Davis*, for purposes of § 924(c), a 'crime of violence' is limited to offenses that contain, as an element, the use of force."  *Harris v. United States*, No. 15-cr-445-11, 2019 WL 5887386, at *1 (S.D.N.Y. Nov. 12, 2019).  *Davis* held that the residual clause of the definition of "crime of violence," § 924(c)(3)(B), was unconstitutionally vague.  *Harris*, 2019 WL 5887386, at *1. Mr. Pizzaro argues that his § 846 narcotics conspiracy was the predicate offense to both his § 924(j) murder charge and § 924(c) firearm charge.  Dkt. No. 186 at 2–3.  Because narcotics conspiracy is not a crime of violence under the definition *Davis* left intact, § 924(c)(3)(A), Mr. Pizzaro argues he is actually innocent of his § 924(c) firearm charge.  Dkt. No. 186 at 2.  He further argues that since his § 924(j) murder charge incorporates § 924(c) expressly by reference, he is actually innocent of that count as well.  Dkt. No. 186 at 2–4.

What Mr. Pizzaro overlooks is that § 924(c) applies to firearms violations related to a "crime of violence" *or* a "drug trafficking crime."  *See* 18 U.S.C. § 924(c)(1)(A).  And even post-*Davis*, § 924(c) remains valid for drug trafficking crimes.  *See, e.g., United States v. Rhodes*, No. 12-cr-31, 2020 WL 1814116, at *1 (S.D.N.Y. Apr. 9, 2020) (holding that *Davis* only applied to "crimes of violence" and therefore did not invalidate a guilty plea to § 846 narcotics conspiracy and § 924(c) firearm

charge); *Moye v. United States*, No. 15-cr-607, 2021 WL 5235049, at *3 (S.D.N.Y. Nov. 10, 2021)

("*Davis* had no impact on sentences imposed for offenses under the "drug trafficking crime" prong

of section 924(c)(1)(A)."); *Harris*, 2019 WL 5887386, at *1 ("The latter means of violating

§ 924(c)"—that is, through a drug trafficking crime—"is unaffected by *Davis*, which limits only the

scope of the . . . term[ ], 'crime of violence.'").

     Mr. Pizzaro's § 924(c) firearm and § 924(j) murder counts were charged as having been

committed "during and in relation to a drug trafficking crime," namely conspiracy to distribute and

possess with intent to distribute cocaine base and cocaine.  Dkt. No. 58.  Those underlying crimes—

conspiracy to distribute and possess with intent to distribute cocaine base and cocaine—are

unquestionably drug trafficking crimes.  *See* 18 U.S.C § 924(c)(2) ("[T]he term 'drug trafficking

crime' means any felony punishable under the Controlled Substances Act . . . ."); 21 U.S.C. §§ 846

and 841(b)(1)(B) (noting that conspiracy to distribute and possess with intent to distribute cocaine

base and cocaine is a felony punishable under the Controlled Substances Act).  Therefore, §§ 924(c)

and (j) apply with full force to Mr. Pizzaro's crimes, the holding in *Davis* is irrelevant to his crimes of

conviction, and the motion to supplement his habeas petition is denied.

### B.  Mr. Pizzaro's Motion to Dismiss for Lack of Jurisdiction

     Mr. Pizzaro's most recent petition to dismiss his counts of conviction due to lack of

jurisdiction is also denied as meritless.  Mr. Pizzaro's argument here involves the Constitution, but is

based on a misunderstanding of fundamental principles.  He argues that federal courts, as opposed

to state courts, cannot punish felonies that occur in the states because (a) that power is not delegated

to the federal government in the United States Constitution and (b) the states retain any undelegated

powers under the Constitution's Tenth Amendment.  *See* Dkt. No. 193 at 5.   Because the states

have not ceded their right to prosecute crimes committed on state land, Mr. Pizzaro argues, the

federal government—including the federal courts—has no jurisdiction to convict Mr. Pizzaro for any crime committed on state land. *See id.*

This argument is creative but erroneous. Congress has the power, under the Constitution's "interstate commerce" clause, to regulate "the channels of interstate commerce," "the instrumentalities of interstate commerce, and persons or things in interstate commerce," and "activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005); U.S. Const. art. I, § 8, cl. 3 (giving Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."). Congress enacted 21 U.S.C. § 846 and § 841(b)(1)(B)—the first crime for which Mr. Pizzaro was convicted—pursuant to its authority to regulate interstate commerce. *See* 21 U.S.C. § 801 (Congress noting that it could penalize the trafficking of drugs because a "major portion of the traffic in controlled substances flows through interstate and foreign commerce," and because even drugs not flowing through interstate commerce "nonetheless have a substantial and direct effect upon interstate commerce"). And Mr. Pizzaro's other crimes under 18 U.S.C. § 924 tie back to this provision, because they penalize "crime[s] of violence or drug trafficking crime[s] . . . for which a person may be prosecuted in a court of the United States"—in Mr. Pizzaro's case, his crime under 21 U.S.C. §§ 846 and 841(b)(1)(B). 18 U.S.C. § 924(c)(1)(A); *see also* 18 U.S.C. 924(j) (referring back to 18 U.S.C. § 924(c)). So under binding Supreme Court caselaw, Congress's enactment of the crimes under which Mr. Pizzaro was convicted was a valid exercise of its power under the interstate commerce clause. As a result, this Court had jurisdiction to hear Mr. Pizzaro's case and, after a jury of his peers found him guilty on all counts, to impose a sentence. *See* 28 U.S.C. § 1331 ("The [federal] district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Mr. Pizzaro's jurisdictional argument is accordingly dismissed.

### C.  Claims of Ineffective Assistance of Counsel

Mr. Pizzaro asserts several claims of ineffective assistance of counsel, all of which fail.[5]  It is well established that the Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth the familiar two-part test for determining whether an attorney's representation was ineffective.

First, the defendant must demonstrate that the representation "fell below an objective standard of reasonableness."  *Id.* at 688.  Under this first prong of *Strickland*, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  The court examines the reasonableness of counsel's actions, keeping in mind that "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").

Second, the defendant must demonstrate that the deficient representation prejudiced him. *Id.* at 694.  The prejudice component of *Strickland* asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

---

[5] Mr. Pizzaro also asserts that his trial counsel failed to investigate witnesses and his "factual defense."  Mot. at 7. However, this argument fails because he does not indicate what additional evidence would have been obtained from additional investigation.  *See Guerrero v. United States,* No. 07-cr-0248, 2017 WL 1435743 at *9 (S.D.N.Y. Apr. 20, 2017) (rejecting ineffective assistance of counsel claim arising from alleged failure to investigate where the petitioner failed to identify what facts could have been discerned by additional investigation).  Similarly, Mr. Pizzaro claims that his trial counsel failed to object to the prosecutor's "inaccurate information in the closing argument." Mot. at 7.  But as Mr. Pizzaro fails to indicate what part of the prosecution's closing argument is improper, he cannot come close to showing that the prosecutor's actions "were so prejudicial that they rendered the trial fundamentally unfair."  *Fox v. Mann,* 71 F.3d 66, 72 (2d Cir. 1995) (quoting *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir. 1986)).

different." *Gueits v. Kirkpatrick*, 612 F.3d 118, 122 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697. To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a plausible claim of ineffective assistance of counsel, not that "he will necessarily succeed on the claim." *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000) (quoting *United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993)).

Mr. Pizzaro fails to show that his counsel was ineffective, much less that he was prejudiced as a result. Accordingly, his ineffective assistance claims fail.

### i.   Trial Counsel

Mr. Pizzaro alleges that his trial counsel made numerous strategic errors including failures to object to testimony, adequately cross-examine witnesses, and file relevant motions. Mr. Pizzaro points to no evidence indicating that his counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Much less has Mr. Pizzaro demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Mr. Pizzaro goes on to assert that he was deprived of the right to testify and that his attorneys conceded his guilt. These claims are contradicted by the record, which shows that Mr. Pizzaro was allowed full opportunity to testify and that counsel represented him with vigor. Finally, Mr. Pizzaro claims that his attorneys failed to challenge improper jury instructions and duplicitous charges. These claims were considered on direct appeal and rejected, indicating that they did not prejudice the outcome of Mr. Pizzaro's trial.

Accordingly, all of Mr. Pizzaro's ineffective assistance of trial counsel claims fail. The Court addresses each in turn.

**(a) Failure to Object and Adequately Cross-Examine Witnesses**

First, Mr. Pizzaro alleges that his trial counsel failed to object to a "lady witness" who allegedly changed her testimony at trial so that it was "inconsistent with her initial proffer."  Mot. at 9.  He also alleges that counsel failed to impeach witnesses and failed to object to the prosecutor "aiding and abetting" Mr. Torres on the stand.  *Id.*  Finally, he claims that his attorney failed to obtain and use Jencks Act material to cross-examine witnesses.  *Id.*; Dkt. No. 183 ("Reply") at 3.

Because the Government only called two eyewitnesses to the stand, and only one identified as a woman, the Court will proceed under the assumption that the "lady witness" Mr. Pizzaro is referencing is Kanesha Bryan.  *See generally* Tr.  Mr. Pizzaro's counsel's decision not to cross-examine Ms. Bryan did not fall "below an objective standard of reasonableness," and therefore his claim fails the first prong of *Strickland.*  466 U.S. at 688.  It is true that Mr. Pizzaro's trial counsel made the choice not to cross-examine her.  This is likely because his counsel viewed Ms. Bryan's testimony as emotionally powerful and difficult to impeach.  Ms. Bryan testified that, walking with her then-four-year-old son, she and her child observed Mr. Pizzaro shoot and kill Mr. Rivera.  Tr. at 111:22–116:8.  She identified Mr. Pizzaro in a police line-up, Tr. at 120:20–121:9, and identified him again in the courtroom, Tr. at 115:5–10.  There was no indication that Mr. Bryan was biased against Mr. Pizzaro, and much of her testimony was corroborated by other sources.  *See* GX 303 (video evidence showing Mr. Pizzaro shooting Mr. Rivera that largely corroborated Ms. Bryan's testimony); Tr. at 77:1–85:2 (another eyewitness, Paul D'Acunto, testifying that he saw Mr. Pizzaro shoot Mr. Rivera).  In light of the nature of Ms. Bryan's testimony—which reminded jurors that Mr. Rivera's murder happened near a pre-school and in view of a four-year-old child—and the additional sources confirming much of it, Mr. Pizzaro's counsel's "[d]ecisions about whether to engage in cross-examination, and if so to what extent and in what manner, [were] . . . strategic in nature."  *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (internal quotation marks and citation omitted).  These types

of decisions "generally will not support an ineffective assistance claim." *Id.* Mr. Pizzaro has not provided any reason for the Court to depart from this rule.

Mr. Pizzaro's claims that trial counsel failed to impeach Government witnesses Ramos and Torres and failed to object to the Government "aiding and abetting" Torres on the stand also fail. First, Mr. Pizzaro's counsel cross-examined Mr. Torres and Mr. Ramos extensively. In Mr. Torres' case, counsel asked about his multiple, documented perjuries, the incentives created by his pending deal with the Government, and generally attempted to portray Mr. Torres as an opportunistic liar. Tr. at 307:9–308:17, 311:3–312:9. Trial counsel probed Mr. Ramos on his record of lying to authorities, hiding and selling drugs in prison, and his incentives to cooperate with the Government due to the prison time he was facing. Tr. at 551:25–552:23, 553:16–555:35, 560:22–562:18.

Mr. Pizzaro's allegations that Mr. Torres and Ramos lied on the stand or were coached by the Government's attorneys do not overcome this "extensive impeachment effort," the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and the "presumption that, under the circumstances, [counsel's] challenged action might be considered sound trial strategy." *Guerrero v. United States,* No. 07-cr-0248, 2017 WL 1435743 at *9 (S.D.N.Y. Apr. 20, 2017) (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks and citation omitted). Indeed, the record plainly contradicts Mr. Pizzaro's assertion that his trial counsel "never served as an advocate and left [him] with no meaningful defense." Reply at 3.

### (b) Failure to File Motion to Suppress

Mr. Pizzaro's assertion that his trial counsel was ineffective for failure to file a motion to dismiss or suppress prejudicial testimony by a perjured witness also fails. "In order to show ineffective assistance for the failure to make a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States v. Gahagen*, 44 F.4th 99, 107 (2d

19

Cir. 2022) (quoting *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990)).  The Court will assume that the perjured witness Mr. Pizzaro is referring to is Mr. Torres because Mr. Torres is on the record as having multiple perjury convictions.  Tr. at 311:3–312:9.

First, Mr. Pizzaro cannot show that the underlying motion would have been meritorious. He does not provide the Court with any basis upon which Mr. Torres's testimony could have been suppressed, instead merely taking issue with the fact that this testimony was "prejudicial" and not credible.  Mot. at 10.  But credibility is challenged through cross-examination, not suppression.  *See United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) ("[T]he proper place for a challenge to a witness's credibility is in cross-examination and subsequent argument to the jury.").  And as referenced above, Mr. Pizzaro's trial counsel thoroughly cross-examined the Government witness in question, specifically and comprehensively asking about his prior perjuries.  Second, even setting aside that any suppression motion would not have been meritorious, the weight of the Government's evidence—including two eyewitnesses, surveillance video, and recorded phone conversation—counsels against the conclusion that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Accordingly, Mr. Pizzaro has failed to show that he is entitled to relief based on his counsel's failure to file a motion to suppress Mr. Torres's testimony.

### (c) Failure to File Motion for Acquittal or New Trial

Mr. Pizzaro asserts that his trial counsel was ineffective for failing to file a Rule 29 motion of acquittal post trial and failing to file a Rule 33 motion for a new trial.  *See* Fed. R. Crim. P. 29; Fed. R. Crim. P. 33.  First, Mr. Pizzaro's trial counsel *did* file a Rule 29 motion of acquittal with regard to count two (the 924(j) murder charge).  Tr. at 717:20–718:17.  This Court denied the motion.  Tr. at 721:3–4.  Second, the Court need not address whether or not Mr. Pizzaro's counsel was deficient

for failing to file the Rule 33 motion because Mr. Pizzaro fails to show that, even had that motion been filed, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Rule 33(a) provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment." Fed. R. Crim. P. 33. Again, Mr. Pizzaro points to no new evidence or "extraordinary circumstances" that would merit granting this motion even had it been made. *United States v. Moore*, 54 F.3d 92, 99 (2d Cir. 1995) ("We review motions for a new trial with caution, and grant them only in extraordinary circumstances.").

The bar for granting a Rule 33 motion is extremely high and, given the substantial incriminating evidence on the record, it is improbable that it would have been granted. *See Romero v. United States*, 28 F.3d 267, 269 (2d Cir. 1994) (denying, in light of overwhelming evidence presented at trial, a Rule 33 motion despite newly discovered evidence that could have been used to impeach DEA officers). In sum, because Mr. Pizzaro's counsel did file a Rule 29 motion of acquittal, and because Mr. Pizzaro cannot show that his trial counsel's failure to file a Rule 33 motion for new trial prejudiced him, his claim for ineffective assistance of counsel cannot be predicated on counsel's failure to file either motion.

### (d) Right to Testify

Mr. Pizzaro's claim that he was given "erroneous advice on [his] right to testify" is likewise without merit. *See* Mot. at 10. He contends that trial counsel's advice "prevented him from entering evidence that would have exonerated him of his 924(j) charge." *Id.* A claim by the defendant that defense counsel has not instructed the defendant on their right to testify—"either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify—must satisfy the two-prong test established in *Strickland.*" *Brown v. Artuz*, 124 F.3d 73, 79 (2d Cir. 1997).

The Court construes Mr. Pizzaro's claim to mean that his attorney effectively overrode his desire to testify. Even so, he cannot show that his testimony would have changed the outcome of his trial. Overwhelming witness, video, and audio evidence was presented against Mr. Pizzaro. Further, based on the arguments raised in his direct appeal and in this petition, it appears that his testimony would have been another iteration of the defense's theory at trial—that Mr. Rivera was killed out of a personal vendetta unrelated to narcotics—which was rejected by the jury. Finally, any question as to whether Mr. Pizzaro understood his right to testify is dispelled by the record. The Court explicitly asked Mr. Pizzaro (1) if he understood that he had the right to testify, (2) if he understood that the choice of whether to testify was his, and (3) if he had spoken with his attorney about the right to testify. He answered all questions in the affirmative, and chose not to testify. Tr. at 722:11–723:2. As Mr. Pizzaro was given the opportunity to testify and did not, and given the extremely low likelihood that his testimony could have altered the outcome of his trial, any advice given by his counsel concerning his right to testify cannot show ineffective assistance.

### (e) Conceding Guilt

Mr. Pizzaro's contention that his trial counsel was ineffective because they "conceded guilt by contradicting client's assertions of innocence" confuses conceding an element of a crime with conceding guilt of a crime. As a strategic choice, "a lawyer may . . . concede an element of the charged crime." *United States v. Rosemond*, 958 F.3d 111,121 (2d Cir. 2020). "Conceding an element of a crime is also reasonable when there is overwhelming evidence of guilt." *United States v. Arnold,* 126 F.3d 82, 89 (2d Cir. 1997).

In her closing statement, Mr. Pizzaro's trial counsel stated: "I'm not here . . . just to hear myself speak. I'm not going to argue about things that are not in controversy. I'm not going to stand up here and try to say to you that the taking of a human life isn't a horrible, despicable event." Tr. at 823:6–10. She did not dispute that Mr. Pizzaro killed Mr. Rivera. *See* Tr. at 823:7–11.

However, Mr. Pizzaro was not on trial for intentional murder, and trial counsel went to great pains to stress that fact to the jury through extensive cross-examination of Mr. Ramos and Mr. Torres as well as in closing arguments:

> If Mr. Pizzaro were simply charged with an intentional murder, we wouldn't be here. This, what happened on November 24, 2015, was not in furtherance or in commission. No one possessed a gun because of drugs on November 24. They weren't even selling drugs at that time. The drug selling had stopped. What happened on November 24 was a culmination of a decade of two men fighting over who was more manly, two men fighting over women, over *machismo*, over 'I'm tougher than you.' The fact that there are two groups of people, and those two groups of people sell drugs, doesn't mean that they are fighting over drug territory and whose customers and whose stuff is better. We know whose stuff is better. It's all the same stuff. They are all selling the same drugs because they are all being supplied by the same person.

Tr. at 823:11–25 (emphasis in original).

Far from conceding guilt, trial counsel vigorously advanced their theory of the case—that Mr. Pizzaro and Mr. Rivera had a long-running, personal feud, unrelated to the sale or distribution of narcotics, eventually culminating in several back-and-forth shootings and ultimately ending in Mr. Rivera's death. That trial counsel's strategic maneuver did not win the day does not give rise to an ineffective assistance of counsel claim. *See United States v. Jones*, 482 F.3d 60, 76–77 (2d Cir. 2006) (rejecting ineffective assistance of counsel claim where trial counsel conceded to a shooting but disputed that the shooting was connected to a narcotics conspiracy).

### (f) Jury Instructions and Duplicity of Charges

Mr. Pizzaro asserts that trial counsel "never challenged the jury instructions or the duplicity of the charges or the fact that the government did not meet three elements required to prove § 924(c) . . . ." Mot. at 10. These arguments were raised and rejected in Mr. Pizzaro's direct appeal. *Pizzaro*, 797 F. App'x at 610–12. For similar reasons, his claims fail here as well.

### 1.   Jury Instruction on Premeditation

Mr. Pizzaro argues that his counsel was ineffective for failing to challenge the Court's failure to provide a premeditation instruction to the jury on his § 924(j) murder charge.  Mot. at 10.  Mr. Pizzaro challenged this lack of an instruction on his direct appeal also.  *See Pizzaro*, 797 F. App'x at 610.  In reviewing the merits of that claim, the Second Circuit considered whether "the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings." *Id.* at 611.  The court found that it did not, because there was "overwhelming evidence that Pizzaro acted with premeditation." *Id.*  This evidence included:  (1) Mr. Pizzaro's involvement in a drug war with Mr. Rivera that involved multiple back-and-forth shootings over the years; (2) surveillance video which showed Mr. Pizzaro notice Mr. Rivera, hide behind a car, remove and cock his gun before chasing Mr. Rivera down, (3) witness testimony indicating that as Mr. Pizzaro chased Mr. Rivera he shouted, "oh, you remember," and (4) surveillance video showing Mr. Pizzaro shoot Mr. Rivera several times, including after Mr. Rivera had fallen to the ground.  *See id.* (citing Tr. at 109–110, 114, 158, 230–232, 383–389; GX 303).  With this evidence in mind, the Second Circuit concluded that Mr. Pizzaro "willfully, deliberately, maliciously, and premeditatedly killed Mr. Rivera," and so the error had not affected his substantial rights. *Id.*

Evaluating the same evidence, this Court comes to the same conclusion:  There is no doubt that Mr. Pizzaro acted with premeditation.  As a result, the evidence presented at trial establishes "beyond a reasonable doubt that a rational jury would have found the defendant guilty" irrespective of a premeditation instruction, and so Mr. Pizzaro's claim fails to satisfy *Stickland*'s prejudice prong. 466 U.S. at 694.

## 2.   Duplicity of Charges

In this appeal, Mr. Pizzaro contends that the Government's § 924(c) gun charge was duplicitous.[6]  Mot. at. 10.  But he took issue with that charge in his direct appeal—and as the Second Circuit explained:

> A count is not duplicitous where it includes . . . multiple ways of committing a single offense.  To the extent Pizzaro's claim is that the jury may not have been unanimous as to what gun he used, we recently noted in a non-precedential summary order that courts . . . have uniformly held that the jury need not be unanimous as to a specific gun that a defendant possessed, used, or carried in violating § 924(c).  To the extent the claim is that the jury may not have been unanimous as to the occasion when he used a gun, Pizzaro points to no case clearly holding that such unanimity is required.  But even were unanimity required, this Court has time and again[ ] held that a general charge regarding unanimity is ordinarily sufficient to protect the defendant's right to a unanimous verdict.  The District Court in Pizzaro's trial gave a general unanimity instruction.  Judge Woods also instructed the jury to make two special findings with respect to whether Pizzaro discharged or brandished the firearm.  The instructions stated that the jury must be unanimous as to whether the firearm was brandished and/or discharged.  Implicit in such an instruction is unanimity as to the occasion of brandishment or discharge.

*Pizzaro*, 797 F. App'x at 612 (quotations and citations omitted).  Put simply, Mr. Pizzaro was unable to show either that the instructions in Count Three represented "plain error" or that any error had affected his substantial rights.  *Id.* at 611–12.  For the same reasons, in *Stickland* terms, Mr. Pizzaro cannot show that his counsel's failure to challenge the § 924(c) instructions "fell below an objective standard of reasonableness" or that any failure to challenge the instructions prejudiced him.  466 U.S. at 688, 694.  As a result, Mr. Pizzaro's ineffective assistance claim fails as it relates to his counsel's failure to challenge the § 924(c) charge.

---

[6] "An indictment is impermissibly duplicitous where:  (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby."  *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).

### ii.    Appellate Counsel

Mr. Pizzaro also fails to show that his appellate counsel's performance entitles him to relief. The two-prong *Strickland* test applies to the evaluation of appellate counsel as well as trial counsel. *Castro v. United States*, 993 F. Supp. 2d 332, 347 (E.D.N.Y. 2014) (citing *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001)). As discussed, this means that Mr. Pizzaro must show that his representation (1) "fell below an objective standard of reasonableness" and (2) that the deficient representation prejudiced the defendant. 466 U.S. at 688, 694.

Mr. Pizzaro asserts that his appellate counsel failed to challenge the sufficiency of the evidence supporting his conviction for his § 924(a) narcotics conspiracy and § 924(j) murder charges. Mot. at 10. As discussed, the evidence of Mr. Pizzaro's participation in a drug conspiracy was overwhelming and the nexus between it and Mr. Rivera's murder is clear. Therefore, Mr. Pizzaro cannot show "a reasonable probability that the result of [his appeal] would have been different" had his appellate counsel challenged the sufficiency of the evidence on either count. *Stickland*, 466 U.S. at 694. Accordingly, his claim regarding his appellate counsel's performance fails.

### D.  Insufficiency of Evidence To Prove Narcotics Conspiracy

Mr. Pizzaro asserts that the Government's evidence was insufficient to establish a narcotics conspiracy. Mot. at 5. The Court disagrees.

When reviewing a challenge under § 2255 for sufficiency of the evidence, the Court must view the evidence presented at trial "in the light most favorable to the government" and "draw all inferences and resolve all issues of credibility in the government's favor." *United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997). The Court also reviews the evidence as a whole, "not in isolation," and must affirm the conviction so long as, from the inferences reasonably drawn, the fact finder might fairly have found guilt beyond a reasonable doubt. *Id.* (quoting *United States v. Podlog*, 35 F.3d 699, 705 (2d Cir. 1994)).

26

If a claim—other than an ineffective assistance of counsel claim—has not been presented on direct review, "the procedural default bar may be overcome only where the petitioner establishes either (1) 'cause' for the failure to bring a direct appeal and 'actual prejudice' from the alleged violations; or (2) 'actual innocence.'" *Zhang*, 506 F.3d at 166 (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)). "To satisfy the 'cause' requirement, the petitioner must show circumstances external to the petitioner, something that cannot be fairly attributed to him." *Id.* (internal quotation marks and citation omitted). "To show prejudice, [the petitioner] must establish . . . that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks and citation omitted).

Mr. Pizzaro claims that the evidence presented at trial did not "substantiate drug trafficking, drug amounts, nor any remnants of [a] drug war." Mot. at 4. He did not raise this claim on direct appeal and therefore must show cause and prejudice. *Zhang*, 506 F.3d at 166. Mr. Pizzaro offers two reasons for not raising these claims on direct appeal. First, he argues that his appellate counsel was ineffective. Mot. at 10. As discussed above, this claim is without merit. Second, he asserts that he has a learning disability and cannot read. Even accepting Mr. Pizzaro's learning disability as 'cause' for purposes of overcoming procedural default, he fails to show errors that "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres*, 316 F.3d at 152.

Mr. Pizzaro takes specific issue with two Government witnesses, Mr. Ramos and Mr. Torres, who he claims should have been impeached and not allowed to testify. Mot. at 5. However, both witnesses were cross-examined at length. At trial, the credibility of Mr. Torres and Mr. Ramos was a central issue. Mr. Torres testified to perjuring himself as a part of his initial cooperation in Mr. Pizzaro's case. Tr. at 302:1–23. On cross-examination, Mr. Torres was questioned about this

perjury and other prior inconsistent statements.  Tr. at 311:3–314:10.  Additionally, he was

questioned about his incentives for testifying against Mr. Pizzaro.  Tr. at 307:7–308:17.  Mr. Ramos

was questioned about the several occasions on which he lied to judges at sentencing.  Tr. at 579:25–

581:25.  He was questioned about, and admitted to, lying to the police.  Tr. at 497:19–25.  He was

also extensively questioned about the extent of his cooperation with the Government and incentives

for doing so.  Tr. at 607:11–611:23.

Despite the potential issues with their credibility, Mr. Ramos and Mr. Torres provided

substantial evidence in support of the Government's case.  Mr. Ramos detailed how he provided

cocaine on a regular basis to Mr. Pizzaro and how Mr. Pizzaro would cook half of it into crack for

Mr. Ramos, Mr. Torres, and Mr. Pizzaro to sell.  Tr. at 451:20–452:13, 464:12–465:23.  Similarly, Mr.

Torres testified that between "summertime" 2015 until just before Mr. Rivera's murder, Mr. Pizzaro

regularly provided him with cocaine and crack to sell.  Tr. at 188:5–189:19, 193:8–194:6.  The jury

also saw bags of cocaine, taken from Mr. Ramos during various arrests, that Mr. Ramos testified had

been given to him by Mr. Pizzaro.  Tr. at 494:20–496:6, 499:1–500:25; GX 421–422.  Jurors also

heard a recorded phone conversation during which Mr. Pizzaro asks Mr. Ramos about "the thing"

Mr. Ramos had on him during his arrest.  Tr. at 510:19–511:5.  Mr. Ramos testified that "the thing"

was crack that Mr. Pizzaro had given him to sell.  *Id.*

Presented with the extensive evidence on the record, the Court cannot say that Mr. Pizzaro's

trial was "infected . . . with error of constitutional dimensions."  *Torres*, 316 F.3d at 152.  The jury

was entitled to make credibility determinations as to Mr. Ramos and Mr. Torres, and to evaluate the

evidence that those witnesses presented as they saw fit.  Doing so, they found the evidence sufficient

to convict Mr. Pizzaro of the three crimes for which he was sentenced.  In short, "viewed as a

whole" and "in the light most favorable to the Government," the evidence was sufficient for a

reasonable jury to convict Mr. Pizzaro of participating in a narcotics conspiracy.  *See Canady*, 126 F.3d at 356.

### E.  Claims of Actual Innocence[7]

Mr. Pizzaro claims that he is actually innocent of his § 924(j) murder charge and § 924(c) gun charge, relying on two news articles and a call transcript.  Mot. at Ex. A, B.  These pieces of evidence do not raise any arguments or inferences other than those presented at trial.  Accordingly, Mr. Pizzaro has not demonstrated that "in light of [this] new evidence, no reasonable juror would find him guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 324.  Therefore, both claims fail.

"A claim of actual innocence must be both 'credible' and 'compelling.'"  *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012) (quoting *House v. Bell,* 547 U.S. 521, 538 (2006)).  A credible claim "must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'"  *Id.* (quoting *Schlup*, 513 U.S. at 324).  "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'"  *Id.* (quoting *House*, 547 U.S. at 538).

Mr. Pizzaro first presents two news articles detailing the 2008 murder of Ronnie Vargas. Mot. at 12, Ex. A.  He claims that this is factual evidence that the dispute between he and David Rivera was not over drugs but rather represented a longstanding personal vendetta.  *Id.*  Next, Mr. Pizzaro presents a page of a call transcript between Hughes Avenue Crew members "Checa" and

---

[7] In support of his claim of actual innocence to the narcotics conspiracy,  Mr. Pizzaro's only "new evidence" is his claim that Mr. Torres and Mr. Ramos perjured themselves at trial.  As discussed above, both witnesses' motives and credibility were laid bare at trial.  This is not "new evidence" that was "not presented at trial."  *Rivas*, 687 F.3d at 541.

Johnathan Santiago, which he claims is factual evidence that his § 924(c) gun charge was not the result of a drug war.  Mot. at 19, Ex. B.[8]

Neither of these pieces of evidence establish Mr. Pizzaro's actual innocence.   First, neither the news stories nor the call transcript are "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence."  *Rivas*, 687 F.3d at 541.  Second, this evidence adds nothing to, but rather repeats, the theory—presented at trial—that Pizzaro's gun use and eventual murder of Mr. Rivera was not related to a narcotics conspiracy.  Tr. at 837:20–838:11; *Pizzaro*, 797 F. App'x at 610.  The Second Circuit considered this exact argument regarding Mr. Pizzaro's 924(j) murder charge and rejected it because "this argument, made with respect to *use*, cannot defeat the valid inference a juror could draw as to why Pizzaro *possessed* the gun at all on the day of the murder.  Possessing the gun in furtherance of the distribution conspiracy . . . is independently sufficient for culpability under § 924(c), regardless of use."  *Pizzaro*, 797 F. App'x at 610.

Finally, even if these documents represented new, critical evidence—which they do not—it would not be true that "more likely than not, in light of the new evidence, no reasonable juror would find [Mr. Pizzaro] guilty beyond a reasonable doubt" because the evidence is still in support of a theory that has been rejected time and time again.  *Rivas*, 687 F.3d at 541.  Accordingly, Mr. Pizzaro's actual innocence claims fail.

---

[8] The phone transcript that Mr. Pizzaro offers is a conversation between Jonathan Santiago and Checa.  Mot. at 19, Ex. B.  This evidence was presented at trial and therefore is not new reliable evidence for purposes of an actual innocence claim.  Tr. at 671:16–672:17, 837:9–838:11; GX 502-01, 502-01-T.  Further, it does not support Mr. Pizzaro's claim, because it merely reiterates arguments raised at trial and on appeal.  In the relevant part of the transcript, Checa says, "[T]hat's the problem Jonathan, I don't want to get involved there because that has nothing to do with Pipi . . . ."  Mot. at 19, Ex. B.  Mr. Ramos testified that "Pipi" is Darwin Ortiz, and that he is Jonathan Santiago's brother.  Tr. at 437:13–439:2.  In the next part of the transcript, which is circled by Mr. Pizzaro, Checa continues, "[T]hat is with Darwin's family, David, and those people and I that mess . . . that mess has been going on for a while and I don't wanna get involved in any of that . . . ."  Mot. at 19, Ex. B.  Here, Mr. Pizzaro crossed out Darwin and wrote in David.  *Id.*  Mr. Pizzaro's implication seems to be that Checa, the then leader of Hughes Avenue drug crew, recognized that there was a long standing "mess" between Mr. Pizzaro and Mr. Rivera in which she did not want to get involved.  This argument was raised and rejected at trial.  Tr. at 837:20–838:11.

### F.  Government Misconduct and Constitutional Claims

Finally, Mr. Pizzaro claims that his Fifth and Sixth Amendment Constitutional rights were violated because the Government (1) knowingly used perjured testimony, (2) unlawfully withheld *Brady* and Jencks Act material, and (3) unlawfully introduced evidence of prior criminal conduct. None of these claims were raised in Mr. Pizzaro's direct appeal, and, as discussed above, he cannot show ineffective assistance of counsel.  Therefore he must show cause and prejudice.  *Zhang*, 506 F.3d at 166.  Even accepting Mr. Pizzaro's assertion that his learning disability and illiteracy constitute cause, he cannot show errors that "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres*, 316 F.3d at 152.  As a result, these claims fail also.

### i.    Perjured Testimony

Mr. Pizzaro claims that the Government "presented perjured testimony [ ] it knew to be false."  Mot. at 8.  "In order to be granted a new trial on the ground that a witness committed perjury, the defendant must show that (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial." *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) (quoting *United States v. Josephberg,* 562 F.3d 478, 494 (2d Cir. 2009)).  Mr. Pizzaro cannot make an initial showing that a witness actually committed perjury, so his claim fails.

The only evidence Mr. Pizzaro offers that a witness actually committed perjury is his assertion that the government "allowed its witness to testify that Mr. Pizzaro shot Darwin Ortiz" when it had a police report stating otherwise in its possession.  Mot. at 8.  However, at trial on direct examination by the Government, *Mr. Torres* testified to shooting Darwin Ortiz or "Nene."  Tr. at 267:12–17, 269:16–273:3.  Further, Mr. Pizzaro's trial counsel highlighted the fact that Mr. Ramos

initially lied to the Government and said that Mr. Pizzaro shot Mr. Ortiz, which was not true.  Tr. at

611:4–15, 631:12–634:5.  Finally, during closing arguments, both Mr. Pizzaro's attorney and the

Government made a point to say that Mr. Torres shot Mr. Ortiz.  Tr. at 837:11–12, 844:22–24.  The

police interview report is consistent with what the testimony made clear at trial—that Mr. Torres,

not Mr. Pizzaro, shot Mr. Ortiz.

### ii.     Withholding *Brady* Material and Violation of 18 U.S.C. § 3500

Mr. Pizzaro claims that the Government withheld material under *Brady v. Maryland* and under

18 U.S.C. § 3500 (the "Jencks Act").  Neither claim has merit.

"There are three components of a true Brady violation:  The evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence

must have been suppressed by the State, either willfully or inadvertently; and prejudice must have

ensued."  *Chrysler v. Guiney*, 14 F. Supp. 3d 418, 449 (S.D.N.Y. 2014), *aff'd*, 806 F.3d 104 (2d Cir.

2015) (quoting *Strickler v. Greene*, 527 U.S. 263 (1999)).  And under the Jencks Act, the Government

must produce certain materials related to the testimony of its own witnesses.  *See* 18 U.S.C. § 3500.

Here, it is entirely unclear what materials Mr. Pizzaro is claiming the Government withheld, which is

reason alone to dismiss the *Brady* claim.  *See Chrysler*, 14 F. Supp. 3d at 450 ("[A]s a general matter,

Brady claims fail where the claimant fails specifically to identify the potential undisclosed *Brady*

materials or to set forth any specific facts indicating that such evidence was withheld." (internal

citation and quotation marks omitted)).  As the Government notes, moreover, if Mr. Pizzaro views a

withheld interview with Mr. Ortiz as the foundation of his *Brady* or Jencks Act claims,[9] that

argument is unavailing.  The interview in question was disclosed to Mr. Pizzaro's attorneys, thereby

foreclosing a *Brady* violation.  *See* Dkt. No. 181 Ex. A.  And Mr. Ortiz never testified at trial, thereby

---

[9] Again, it is not clear to the Court, even reading Mr. Pizzaro's petition broadly, that this interview is the foundation of his *Brady* and Jencks Act claims—but the Court includes this analysis out of an abundance of caution.

foreclosing a Jencks Act violation.  *See* 18 U.S.C. 3500(b) (applying the Jencks Act only to those

witnesses who "testif[y] on direct examination").  Accordingly, Mr. Pizzaro's *Brady* and Jencks Act

claims fail.

### iii.    Introduction of Prior Criminal Conduct

Finally, Mr. Pizzaro claims that the Government improperly introduced allegations of prior

criminal conduct, some of which occurred when Mr. Pizzaro was a minor, and none for which he

was ultimately convicted.  Mot. at 7–8.  The Court and the parties devoted extensive time to

determine what evidence would and would not be allowed at trial and Mr. Pizzaro fails to identify

any place in the record where the Government deviated from the Court's evidentiary rulings or any

authority indicating that the Court's evidentiary rulings were in error.  Therefore his claims are

without merit.

Under Federal Rule of Evidence 404(b), "[e]vidence of any other crime, wrong, or act is not

admissible to prove a person's character in order to show that on a particular occasion the person

acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  However, such evidence may be

admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan,

knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2); *see also United

States v. Lyle,* 919 F.3d 716, 736 (2d Cir. 2019) (noting that in the Second Circuit, other acts evidence

under Rule 404(b) is admissible "for *any* purpose other than to show a defendant's criminal

propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of

Rule 403 of the Federal Rules of Evidence" (emphasis added) (internal quotation omitted)).  Not all

evidence of uncharged misconduct, moreover, falls within by Rule 404(b)'s scope to begin with.

Rather, "[e]vidence of uncharged criminal activity is not considered other crimes evidence"—and

thus is not subject to 404(b)—"if it arose out of the same transaction or series of transactions as the

charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or

if it is necessary to complete the story of the crime on trial." *Id.* (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)).

This Court found that the evidence of Mr. Pizzaro's prior narcotics dealing and involvement in prior shootings were all admissible as both "direct evidence" of the charged narcotics conspiracy and as "other acts" evidence under 404(b).  Dkt. No. 94 ("Pretrial Conf. Tr.") at 39:7–42:12.

As direct evidence, prior narcotics dealing would "assist in completing the story of the charged offenses for the jury" and was "inextricably intertwined with the offenses charged in the indictment."  *Id.*  It would "also help to explain the development of the illegal relationship that defendant had with CW-1 and CW-2, two of his alleged coconspirators . . . ."  *Id.*; *see United States v. Rosa*, 11 F.3d 315, 333–34 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.").

Moreover, the same evidence was admissible "other acts" evidence under Rule 404(b) "for proper purposes, namely, to show defendant's intent, among other things, to show defendant's intent to deal narcotics on the Arthur Avenue block and his motive to murder Mr. Rivera."  Pretrial Conf. Tr. at 40:12–23.  Further, the evidence was "relevant to the charged narcotics offenses, firearm offenses, and the murder charge.  It [was] no more serious than the charged offenses, and its admission is therefore not barred under 403 for that, or for any other reason . . . ."  *Id.*; *see United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (evidence is not unduly prejudicial when it is not "more inflammatory than the charged crimes").

This Court applied a similar analysis to the Government's evidence of Mr. Pizzaro's shooting at Mr. Rivera in 2011.  As direct evidence, this testimony "helped complete the story of the charged offenses" and was "inextricably intertwined with them" because it "support[ed] the story, the

government's alleged thesis, that the murder of Rivera in November of 2015 . . . was the culmination of a long-running drug-dealing turf war." Pretrial Conf. Tr. at 42:24–43:7. As other acts evidence, it illuminated Mr. Pizzaro's intent to kill Mr. Rivera, and was relevant to the charged narcotics, firearms, and conspiracy charges, and was no more inflammatory than the charged crimes. Pretrial Conf. Tr. at 43:9–16.

Importantly, this Court excluded evidence that it believed was substantially more prejudicial than it was relevant. This evidence included testimony that Mr. Pizzaro fired a gun off a roof in 2007 and testimony that Mr. Pizzaro allegedly participated in four robberies. Pretrial Conf. Tr. at 51:6–52:5, 52:9–53:13. Further, the Court went to great lengths to ensure that Mr. Pizzaro was not unfairly prejudiced by being labeled as a member of the Bloods due to the "particularly inflammatory" nature of the affiliation. Pretrial Conf. Tr. at 53:14–61:13.

Mr. Pizzaro does not identify any point during the trial when the Government deviated from the Court's evidentiary rulings, and, to the extent that he takes issue with those rulings, has not identified authority indicating that they were made in error. *See United States v. Tarricone,* 996 F.2d 1414, 1422 (2d Cir. 1993) ("A district court has broad discretion to admit evidence pursuant to Rule 404(b) . . . .").

Mr. Pizzaro cannot show that the evidence entered against him was improperly admitted, and therefore his final claim fails.

## V.   CONCLUSION

For the reasons stated above, Mr. Pizzaro's petition is denied. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S.

438, 444–45 (1962).  Mr. Pizzaro has not made a substantial showing of the denial of a constitutional right, so the Court denies a certificate of appealability under 28 U.S.C. § 2253.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 178, 185, and 193 in *United States v. Ruben Pizzaro,* No. 1:16-cr-54-GHW.  The Clerk of Court is further directed to enter judgment for the Respondent and to close Mr. Pizzaro's civil action, *Ruben Pizzaro v. United States*, No. 1:21-cv-01149-GHW.  Finally, the Clerk of Court is directed to mail a copy of this opinion to Mr. Pizzaro.

SO ORDERED.

Dated:  March 3, 2023
      New York, New York

                                     GREGORY H. WOODS
                              United States District Judge